**Dennis Paul KRIDER, Appellant,**

v.

**STATE of Missouri, Respondent.**

**No. WD 58053.**

Missouri Court of Appeals,
Western District.

Feb. 27, 2001.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 1, 2001.

Application for Transfer Denied
June 26, 2001.

Kent E. Gipson, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Susan K. Glass, Andrea Mazza Follett, Asst. Attys. Gen., Jefferson City, for respondent.

Before BRECKENRIDGE, P.J., and ULRICH and HOWARD, JJ.

HOWARD, Judge.

Dennis Krider appeals from the motion court's denial of his Rule 24.035 motion for postconviction relief. Krider raises two points on appeal. First, he claims the motion court erred in denying his motion because the record established that his guilty plea was involuntary and that he received ineffective assistance of counsel when his trial counsel falsely informed him that if he did not plead guilty he would get the death penalty at the culmination of the trial. Second, he claims the motion court clearly erred in not finding that he was abandoned by his Rule 24.035 motion counsel and in finding that he was not denied effective assistance of counsel due to the failure of his postconviction counsel to call necessary witnesses to testify.

We affirm.

### Facts

By a seven-count information filed February 23, 1998 in the Circuit Court of Henry County, Missouri, Dennis Krider was charged with first degree murder, forcible rape, first degree burglary, forcible sodomy, and three counts of armed criminal action. An amended information deleted one of the armed criminal action counts.

On August 26, 1998, Krider was present at his jury trial in the Circuit Court of Henry County, but chose to end the trial and plead guilty to second degree murder and forcible rape. The State dismissed the remaining counts. In accordance with the plea agreement, Krider was sentenced to a term of life imprisonment for second degree murder and twenty years for forcible rape, the sentences to run concurrently with each other. During his guilty plea hearing, Krider testified, among other things, that he understood the range of punishment on a class A felony, that he understood the plea agreement, that he was satisfied with the services of his trial counsel, Clinton Wright, and that Mr. Wright had not forced him to plead guilty or threatened him in any way.

Krider filed a timely pro se Rule 24.035 motion. Krider's counsel subsequently filed a timely amended Rule 24.035 motion. Krider set forth several allegations in his motion. For the purpose of this appeal, the relevant allegation is as follows:

8(A). Mr. Krider's guilty plea was not entered knowingly, intelligently, and voluntarily, because plea counsel Clinton Wright coerced Mr. Krider to enter a guilty plea against his will. Mr. Krider decided to plead guilty because Mr. Wright coerced him emotionally. Mr. Wright implied that Mr. Krider could be sentenced to death if he continued with his trial, and told Mr. Krider that he (Mr. Wright) had no idea what he would do if he had to return to the courtroom to continue trying the case. Mr. Krider and his parents were frightened both by Mr. Wright's threat that Mr. Krider could be sentenced to death and by his apparent lack of preparation to defend Mr. Krider.... Mr. Wright was constitutionally ineffective in his representation of Mr. Krider. Mr. Krider would not have pleaded guilty if he had not been threatened and coerced.... Mr. Krider was denied his rights to due process of law, to a jury trial, and to the effective assistance of trial counsel, as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and by Article I, Sections 10, 18(a), and 22(a) of the Missouri Constitution, when he entered his guilty pleas unknowingly, involuntarily, and unintelligently.

A hearing was held on Krider's motion. Krider was present with his counsel. Mark Gladfelter, a deputy sheriff with the Henry County Sheriff's Department, testified that he was present when Clinton Wright, Krider, and Krider's parents were listening to a tape during Krider's trial. He testified as follows:

Q. Okay, did you hear Mr. Wright mention anything about needles or a syringe?

A. He said something to the effect of needles throughout this. I cannot tell you his exact words towards it.

I can tell you what I think that he was getting at with it. I think what he was saying was, that if, if they go on and the jury hears the tape, the jury is going to give the stiffest penalty they can.

And I do know that a needle was mentioned, but I cannot give exact words of how it was mentioned.

Q. But you did hear him use that term?

A. Yes.

Q. In relation to the jury giving a stiff sentence?

A. That is how I took it. He didn't actually say it, but he did mention needles and that is how I took it, is that the jury would give a stiff sentence, if they had heard the tape.

\* \* \* \* \*

Krider testified, in relevant part, as follows:

Q. Okay, and we have heard some testimony about the use of the word "needle." Did [Mr. Wright] use that term with you?

A. Yes.

Q. What exactly did he say as far as needle?

A. At that point and time, my understanding was and the way he was pre-senting it to me, was that if I didn't take this plea, that I would get the worst maximum sentence possible.

And in my way of thinking, that is a death penalty when he brought up the needle, syringe or whatever you want to call it.

In my way of thinking, it was a choice between a death penalty or thirty years in prison. Well, neither of them sounds too good to me, but thirty years beats a death penalty.

Q. And what, what specific words did he use? Do you remember exactly what he said?

A. Basically, when we got back there, the whole gist of the conversation was, he didn't know what he was going to do to defend me any more. It was pretty obvious he had given up.

My father and I didn't feel like we could switch attorneys, at that point and time. He was saying, you know, you will get the maximum sentence, which, like I said, my way of thinking is the death penalty.

And when he brought up the syringe and the needle in the conversation the way he did, it just made me feel like that was going to be part of it, which later on, when I was in Fulton and reviewing some things, it became obvious to me that, during the trial, they had said that it was a non-death penalty case.

At this time, being a little emotional and upset and pressured, that didn't click in my head. And my parents didn't catch it either or they would have said something.

Q. So, you didn't realize you had just forgotten or gone out of your head that the death penalty wasn't in the case, at the time you were thinking about the guilty plea?

A. There was just a tremendous amount of pressure at that point and

time. And with him bringing up the needle and saying I would get the maximum sentence, of course, I am taking my lawyer's advice, assuming he is doing the best for me.

And that isn't necessarily the way it worked out, as far as I am concerned.

Q. Now, you keep talking about the needle. I am trying to get you to say exactly what he said about the needle.

A. When he brought it up in the conversation.

Q. I mean, do you recall the specific words that he used?

A. I can't say specifically, exactly what he said. I can just give you the general gist of the conversation and the needle was definitely brought up.

The way he brought it up implied that I would be receiving a death penalty, other than that, I don't know how to explain it any better.

\* \* \* \* \*

Krider also testified that he lied during his guilty plea hearing when he was under oath.

Leroy Krider, Dennis Krider's father, testified, in relevant part, as follows:

Q. Okay, now, do you recall what advice Mr. Wright gave Dennis Krider about what sentence he would receive?

A. No, other than he was talking about, as I recall, somewhere around thirty years.

Other than that, you know, if he didn't plead, he did say that the possibility of the maximum penalty would be the syringe.

Q. Oh, really?

A. Yes.

Q. I mean, he did mention a needle or syringe?

A. A needle, I believe he said "needle."

Q. And what did he say about that?

A. He said, as far as he was concerned, Dennis didn't have a choice or an option, but he, you know, was either a death, possibility of a death sentence or the plea bargain.

Q. And were you aware, going in, that this was not a death penalty case?

A. Oh, yeah, in the very beginning we were informed that it wasn't, but once we were under, you know, the emotional strain, that never even crossed my mind.

In fact, it didn't cross my mind or my wife's until, I think Dennis may have called us from Fulton and said, hey, that wasn't even a question. We didn't realize that or didn't, it didn't register. Let's put it that way, because the Judge had instructed in the very beginning, it was not a death penalty, but that, that was totally gone with all of the emotion that we had.

\* \* \* \* \*

In its judgment, the motion court stated that "[a]ll issues regarding [Krider's] credibility will be resolved against him." The motion court found as follows:

15. As to the grounds in Paragraph 8(A) of the Amended PCR motion:

a) If counsel did imply that Movant could get a death sentence if Movant decided to continue the trial and not plead guilty—which is unlikely—Movant knew or should have known that the death penalty was not being asked by the State and not within the range of punishment.

i) Movant was present when arraigned on these charges on February 23, 1998. The State was given three weeks to notify Defendant whether or not it would seek the death penalty on murder in the first degree. The State elected not to seek the death penalty, and for at least five months before the trial death

was not a possible punishment for Movant.

ii) Movant's father knew this from Meetings with Movant's counsel.

iii) When Movant was formally arraigned on the Class A felony of murder in the first degree on the first morning of trial (the day before he pleaded), he was told by the court that the "range of punishment on a Class A felony of murder in the first degree, if one should be convicted of it is life without the possibility of parole." Movant responded that he understood that. *Transcript of Proceedings*, Pages 5 and 6.

iv) It is incredulous to believe that Movant did not know it either, and just couldn't recall being told it was not a death penalty case or not remembering death was not in the range of punishment for the murder for which he was on trial. He knew, it wasn't—unless he got a continuance and the State sought the death penalty in a later trial based upon the new clarity of the tape or some other reason.

The trial court concluded that Krider's counsel was not ineffective in representing him and denied his motion. This appeal follows.

### Standard of Review

■ Appellate review of the motion court's denial of a Rule 24.035 motion for postconviction relief is limited to whether the findings and conclusions of the motion court are clearly erroneous. Rule 24.035(k); *Reynolds v. State*, 994 S.W.2d 944, 945 (Mo. banc 1999), *cert. denied*, 528 U.S. 1120, 120 S.Ct. 944, 145 L.Ed.2d 820 (2000). The motion court's findings and conclusions are clearly erroneous only if, after reviewing the entire record, the appellate court is left with the definite and firm impression that a mistake has been made. *Reynolds*, 994 S.W.2d at 945.

### Point I

■ Krider's first point on appeal is that the motion court clearly erred in denying his Rule 24.035 motion for postconviction relief because the record established that his plea of guilty was involuntary and that he received ineffective assistance of counsel when his trial counsel falsely informed him that if he did not plead guilty he would get the death penalty at the culmination of the trial. Krider claims that had this threat not been made, he would have refused to plead guilty and proceeded with trial.

■ "To prevail on an ineffective assistance of counsel claim, the movant must show that (1) trial counsel's performance was deficient in that he failed to exercise the customary skill and diligence that a reasonably competent attorney would perform under similar circumstances and (2) the deficient performance prejudiced the movant." *State v. Miller*, 981 S.W.2d 623, 633 (Mo.App. W.D.1998), citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "[T]o satisfy the 'prejudice' requirement, a defendant challenging a guilty plea based on ineffective assistance must allege facts showing 'that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.' " *Coates v. State*, 939 S.W.2d 912, 914 (Mo. banc 1997), quoting *Hill v. Lockhart*, 474 U.S. 52, 59, 106 S.Ct. 366, 370, 88 L.Ed.2d 203 (1985). Because Krider's convictions were the result of negotiated pleas of guilty, any claim of ineffective assistance of counsel "is immaterial except to the extent that it impinges upon the voluntariness and knowledge with which the plea[s] [were] made." *Stufflebean v. State*, 986 S.W.2d 189, 192 (Mo.App. W.D.1999). "The movant bears the burden of proving his post-conviction claims,

including a claim of ineffective assistance of counsel, by a preponderance of the evidence." *Copas v. State*, 15 S.W.3d 49, 54 (Mo.App. W.D.2000).

■■■■■ "[A] guilty plea must be a voluntary expression of the defendant's choice, and a knowing and intelligent act done with sufficient awareness of the relevant circumstances and likely consequences." *State v. Roll*, 942 S.W.2d 370, 375 (Mo. banc 1997). In order to be entitled to postconviction relief based on a mistaken belief about a sentence, a movant's claim of mistaken belief must be reasonable. *McFarland v. State*, 796 S.W.2d 674, 676 (Mo.App. W.D.1990). In addition, "[w]hen a movant for post-conviction relief claims he made his guilty plea involuntarily because counsel misled him, the test applied is whether [the] movant's belief was reasonable." *Copas*, 15 S.W.3d at 54. "A mistaken belief is reasonable only when it is based on a positive representation upon which the movant is entitled to rely." *McFarland*, 796 S.W.2d at 676–77. While an individual may proclaim he had a certain belief and may subjectively believe it, if it was unreasonable for him to entertain such a belief at the time of the plea proceeding, relief should not be granted. *State v. Rice*, 887 S.W.2d 425, 428 (Mo. App. W.D.1994). Where there is no reasonable basis for the movant's belief in light of the guilty plea record, the movant is not entitled to relief. *Id.*

Krider cites three cases that he claims are similar to the case at bar. The first of these cases is *Copas v. State*, 15 S.W.3d 49 (Mo.App. W.D.2000). The issue in *Copas* was whether the movant was entitled to an evidentiary hearing on his Rule 24.035 motion. *Copas*, 15 S.W.3d at 55. The court concluded that because there was nothing in the record that refuted the movant's allegation that his counsel advised him that it would be up to him to prove he was

innocent, he was entitled to an evidentiary hearing. *Id.* at 56. We stated that "[i]f counsel affirmatively misrepresents a collateral consequence of pleading guilty to a defendant and the defendant relies upon that misrepresentation in making a decision to plead guilty, counsel's misrepresentation may result in an ineffective assistance of counsel." *Id.* at 55–56.

The second case Krider cites in support of his claim is *Nunn v. State*, 23 S.W.3d 910 (Mo.App. W.D.2000). As in *Copas*, this case involved the issue of whether the movant was entitled to an evidentiary hearing on his Rule 24.035 motion, in which he alleged that his counsel told him that no jury could acquit him of the charged offenses upon learning that he had been charged in a subsequent assault case. *Nunn*, 23 S.W.3d at 912. We held that because there was nothing in the record to refute the movant's contention, the movant was entitled to an evidentiary hearing on his motion. *Id.* at 913.

■■■■■ *Copas* and *Nunn* are distinguishable from the present case. Those cases considered whether the movant was entitled to an evidentiary hearing on his Rule 24.035 motion, whereas the issue in the present case is whether the motion court erred in denying Krider's Rule 24.035 motion following a hearing. The movant's burden to show that he is entitled to an evidentiary hearing on his motion is different from his burden to prevail on his claim of ineffective assistance of counsel. "In order for a movant to be entitled to an evidentiary hearing on a Rule 24.035 motion, the movant must meet three requirements: (1) movant must allege facts not conclusions which, if true, would warrant relief; (2) the facts must not be refuted by the record; and (3) the allegations of the movant must have resulted in prejudice." *Copas*, 15 S.W.3d at 55. "To prevail on a claim of ineffective assistance of counsel, the movant must establish that: (1) coun-

sel provided deficient performance in that counsel failed to exercise the customary skill and diligence that a reasonably competent attorney would perform under similar circumstances; and (2) counsel's deficient performance prejudiced the movant." *Id.* at 54. Moreover, the motion court is free to believe or disbelieve any evidence, whether contradicted or undisputed, including the movant's testimony, and we defer to the motion court on matters of credibility. *Saffold v. State,* 982 S.W.2d 749, 752 (Mo.App. W.D.1998). The motion court in this case specifically found that Krider had admittedly lied at his guilty plea hearing, and "[a]ll issues regarding [Krider's] credibility will be resolved against him."

The third case Krider cites in support of his claim is *Ivy v. Caspari,* 173 F.3d 1136 (8th Cir.1999). In that case, Ivy was convicted of second degree murder and armed criminal action and sought a writ of habeas corpus alleging ineffective assistance of counsel and that his guilty plea was not knowingly and voluntarily entered. *Ivy,* 173 F.3d at 1139–40. The district court granted the writ, and the State appealed. The Eighth Circuit held as follows:

> [T]he district court found that counsel erroneously believed that Ivy might face the death penalty and that he had so advised Ivy.[1] Ivy, however, was not eligible for the death penalty under Missouri law. Laboring under the misinformation about the possibility of receiving the death penalty, Ivy could not have made a voluntary and intelligent choice between alternative courses of action.

*Id.* at 1143. (Footnote and citations omitted.) The court held that the district court did not err in finding that the ineffective assistance of trial counsel, coupled with inadequate advice by the trial court, resulted in an unknowing and involuntary guilty plea. *Id.* at 1144.

*Ivy* is also distinguishable from the present case. In *Ivy,* the district court specifically found that Ivy's counsel believed he was subject to the death penalty, and so advised him. Furthermore, there was no indication that Ivy had ever been informed that he was not subject to the death penalty. In the present case, the motion court found that it was "unlikely" that Krider's counsel implied that he could get a death sentence. In addition, in this case, Krider had previously been informed that the maximum sentence he could receive if convicted of first degree murder was life without the possibility of parole.[2]

In *Ingram v. State,* 774 S.W.2d 853, 854 (Mo.App. E.D.1989), a movant claimed that his guilty plea was not voluntary because it was made to avoid the risk of being sentenced to death, even though death was not a possible punishment for felony murder, the crime with which he was charged. The movant apparently claimed that he mistakenly believed that the death penalty was a possible punishment for felony murder. *Ingram,* 774 S.W.2d at 854. The court stated that the test to be applied when determining voluntariness is whether there is a reasonable basis in the guilty plea record for the movant to have such a

1. The court stated in a footnote that "[i]t is of more than passing significance that the State did not call trial counsel to testify at the evidentiary hearing conducted by Judge Laughrey." *Id.* at 1143 n. 3.

2. Although the trial transcript is not included in the record, the motion court found that "[w]hen Movant was formally arraigned on the Class A felony of murder in the first degree on the first morning of trial (the day before he pleaded), he was told by the court that the 'range of punishment on a Class A felony of murder in the first degree, if one should be convicted of it is life without the possibility of parole.' Movant responded that he understood that." Krider does not dispute the motion court's finding.

belief. *Id.* The plea transcript in that case revealed that the trial court asked the movant's trial counsel whether he had informed movant of the range of punishment for felony murder. *Id.* Counsel responded, "The statute provides only one punishment and that is imprisonment for natural life." *Id.* at 854–55. The court asked the movant, "Do you understand that?" and the movant responded, "Yes, sir." *Id.* at 855. The court held that because the possible punishment was explained unambiguously to the movant, there was no reasonable basis for the movant to have believed the death penalty was a possibility. *Id.*

We hold that the motion court did not clearly err in finding that it was unlikely that Mr. Wright implied that Krider would receive the death penalty if he did not plead guilty. Krider and Mr. Gladfelter testified that Mr. Wright made remarks about a needle and a syringe, but never testified that counsel told Krider he would receive the death penalty if he did not plead guilty. Krider's father was the only witness who testified that Mr. Wright stated that if Krider did not plead guilty, the maximum penalty would be the syringe. As previously stated, the trial court was entitled to disbelieve this testimony. Furthermore, the motion court did not clearly err in concluding that even if Mr. Wright did imply that Krider may receive the death penalty if he did not plead guilty, it was not reasonable for Krider to believe that, given the fact that Krider was informed during his arraignment that the maximum punishment he could receive was life imprisonment without the possibility of parole.

Point I is denied.

### Point II

Krider's second point on appeal is that the motion court clearly erred in not finding that he was abandoned by his Rule 24.035 motion counsel and in finding that

he was not denied effective assistance of postconviction counsel due to the failure of his counsel to call necessary witnesses, including his trial counsel, trial investigator and independent witnesses, to testify at his postconviction hearing.

There is no constitutional right to counsel in a postconviction proceeding, nor is there a constitutional claim to ineffective assistance of postconviction counsel. *State v. Hunter*, 840 S.W.2d 850, 871 (Mo. banc 1992). "Claims of ineffective assistance of post-conviction counsel are categorically unreviewable." *Id.* However, "an exception to this rule applies where the record shows that a movant has been abandoned by his postconviction counsel." *Morgan v. State*, 8 S.W.3d 151, 153 (Mo. App. S.D.1999). "The Missouri Supreme Court has recognized two forms of abandonment in Rule 24.035 post-conviction proceedings." *Edwards v. State*, 954 S.W.2d 403, 406 (Mo.App. W.D.1997), citing *Moore v. State*, 934 S.W.2d 289, 291 (Mo. banc 1996). First, abandonment occurs when postconviction counsel takes no action on the movant's behalf and, as a result, it appears on the face of the record that the movant is deprived of a meaningful review of his postconviction claims. *Moore*, 934 S.W.2d at 291, citing *Luleff v. State*, 807 S.W.2d 495, 498 (Mo. banc 1991). Second, when the record reflects that postconviction counsel has determined that there is a sound basis for amending the pro se motion but fails to file the amended motion in a timely manner, such failure is, in effect, another form of abandonment. *Moore*, 934 S.W.2d at 291, citing *Sanders v. State*, 807 S.W.2d 493, 494–95 (Mo. banc 1991).

In *Laughlin v. State*, 822 S.W.2d 578, 579 (Mo.App. S.D.1992), the movant alleged that the motion court erred in denying his Rule 24.035 motion because his postconviction attorneys abandoned him by failing to call any witnesses at his postcon-

viction hearing in order to prove the claims asserted in the pro se and amended motions. The court held that the movant could not obtain review of postconviction counsel's alleged ineffectiveness in failing to call witnesses by labeling his counsel's alleged dereliction "abandonment." *Laughlin,* 822 S.W.2d at 580. We found that to review that point "would go far beyond the narrow compass of *Sanders* and *Luleff,* and as stated in *Sanders* 'would defeat the clear provision of subsection (k).' " *Id.,* quoting *Pollard v. State,* 807 S.W.2d 498, 502 (Mo. banc 1991).

Similarly, in the present case, we find that Krider may not obtain review of his postconviction counsel's alleged ineffectiveness in failing to call witnesses by labeling his counsel's alleged dereliction "abandonment."

Point II is denied.

The judgment of the motion court is affirmed.

BRECKENRIDGE, P.J., and ULRICH, J., concur.